United States District Court
Southern District of Texas
**FILED**

JAN 1 7 2012

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. **12 CR 022**_____ |
| | ) | |
| v. | ) | |
| | ) | 18 U.S.C. § 371 |
| MARUBENI CORPORATION, | ) | 15 U.S.C. § 78dd-2 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFERRED PROSECUTION AGREEMENT

Defendant Marubeni Corporation ("Marubeni"), a corporation organized under the laws of Japan, by its undersigned authorized representatives, and pursuant to authority granted by its Board of Directors, and the United States Department of Justice, Criminal Division, Fraud Section (the "Department"), enter into this Deferred Prosecution Agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      Marubeni acknowledges that the United States will file a two-count criminal Information in the United States District Court for the Southern District of Texas charging Marubeni with (a) conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, that is, to violate the anti-bribery

1

provisions of the Foreign Corrupt Practices Act ("FCPA"), as amended, 15 U.S.C. §§ 78dd-1 and 78dd-2 (Count One), and (b) aiding and abetting a violation of the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-2, and 18 U.S.C. § 2 (Count Two).   In so doing, Marubeni knowingly waives: (a) its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Texas.

2.     Marubeni admits, accepts, and acknowledges that it is responsible under U.S. law for the acts of its employees and agents as set forth in the Statement of Facts attached hereto as Attachment A, and incorporated by reference into this Agreement, and that the facts described in Attachment A are true and accurate. Should the Department pursue the prosecution that is deferred by this Agreement, Marubeni agrees that it will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding.   Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.

## Term of the Agreement

3.     This Agreement is effective for a period beginning on the date on which the criminal Information is filed and ending two (2) years and seven (7) calendar days from that date (the "Term").  Marubeni agrees, however, that in the event that the Department determines, in its sole discretion, that Marubeni has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Department for up to a total additional time period of one year, without prejudice to the Department's right to proceed as provided in paragraphs 14-17 below.  Any extension of the Agreement extends all terms of this Agreement for an equivalent period.

## Relevant Considerations

4.     The Department enters into this Agreement based on the individual facts and circumstances presented by this case.  Among the facts considered were that Marubeni has agreed to undertake remedial measures as contemplated by this Agreement, and the impact on Marubeni, including collateral consequences, of a guilty plea or criminal conviction.

5.     Marubeni shall cooperate with the Department's investigation of the scheme described in Attachment A, subject to applicable Japanese laws and

regulations.   Subject to the foregoing limitations, Marubeni agrees that its cooperation shall include, but is not limited to, the following:

a.   Marubeni shall truthfully disclose all factual information, including documents, records, or other tangible evidence, not protected by a valid claim of attorney-client privilege or work product doctrine with respect to Marubeni's activities and those of its present and former directors, officers, employees, agents, consultants, contractors, subcontractors, and subsidiaries concerning all matters relating to corrupt payments and related false books and records and inadequate internal controls, about which it has any knowledge and about which the Department may inquire.

b.   Upon request of the Department, Marubeni shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 5(a) above on behalf of Marubeni.   It is further understood that Marubeni must at all times provide complete, truthful, and accurate information.

c.   Marubeni also shall use its best efforts to make available for interviews or testimony, as requested by the Department, present or former directors, officers, employees, agents, consultants, contractors, and subcontractors of Marubeni.   This obligation includes, but is not limited to, sworn testimony

before a federal grand jury or in federal trials, as well as interviews with federal law enforcement and regulatory authorities. Cooperation under this Paragraph will include identification of witnesses who, to the knowledge of Marubeni, may have material information regarding the matters described in Paragraph 5(a).

       d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Department pursuant to this Agreement, Marubeni consents to any and all disclosures consistent with applicable law and regulation to other governmental authorities of such materials as the Department, in its sole discretion, shall deem appropriate.

### Payment of Monetary Penalty

6.    The Department and Marubeni agree that the application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

A. The 2010 USSG Manual sets forth the appropriate guidelines to be used in this matter.

B. Base Fine: Under USSG § 8C2.4(d), the base fine is $45.5 million, calculated as follows:

| | |
|---|---|
| Base offense level (§ 2C1.1(a)) | 12 |
| More than one bribe (§ 2C1.1(b)(1)) | + 2 |
| Benefit received $20M - $50M ((§ 2C1.1(b)(2)) | +22 |
| | 34 |

C.  Culpability Score: Based upon USSG § 8C2.5, the culpability score is 6, summarized as follows:

|  |  |
|---|---|
| Base Culpability Score (§ 8C2.5(a)) | 5 |
| Individual within substantial authority personnel participated in, condoned, or was willfully ignorant of offense (§ 8C2.5(b)(4)) | +2 |
| (g)  The organization clearly demonstrated recognition and affirmative acceptance of responsibility for criminal conduct (§ 8C2.5(g)(3)) | -1 |
| Total | 6 |

D.  Calculation of Fine Range: Based upon USSG § 8C2.7, the fine range is calculated as follows:

|  |  |
|---|---|
| Base Fine | $45.5 million |
| Multipliers | 1.2/2.4 |
| Fine Range | $54.6 million/$109.2 million |

Marubeni agrees to pay a monetary penalty in the amount of $54.6 million. Marubeni agrees to pay this monetary penalty to the United States Treasury within ten days of the execution of this Agreement. The $54.6 million penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Department that, in the event of a breach of this Agreement, the $54.6 million amount is the maximum penalty that may be imposed in any future prosecution, and the Department is not precluded from arguing in any future

prosecution that the Court should impose a higher fine, although the Department agrees that under those circumstances, it will recommend to the Court that the amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.   Marubeni acknowledges that no United States tax deduction may be sought in connection with the payment of any part of this $54.6 million penalty.

## Conditional Release from Criminal Liability

7.    In return for the full and truthful cooperation of Marubeni described in Paragraph 5, and its compliance with the other terms and conditions of this Agreement, the Department agrees, subject to Paragraphs 14-16 below, not to use any information related to the conduct described in the attached Statement of Facts against Marubeni in any criminal case, except: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.  In addition, the Department agrees, except as provided herein, that it will not bring any criminal case against Marubeni related to the conduct of present and former directors, officers, employees, subsidiaries,

affiliates, agents, consultants, contractors, and subcontractors of Marubeni, as described in the attached Statement of Facts.

      a.    This Paragraph 7 does not provide any protection against prosecution for any future corrupt payments, false books and records, or inadequate internal controls, if any, by Marubeni, or by any of its directors, officers, employees, agents, consultants, contractors, subcontractors, and subsidiaries, irrespective of whether disclosed by Marubeni pursuant to the terms of this Agreement.

      b.    In addition, this Paragraph 7 does not provide any protection against prosecution of any present or former director, officer, employee, shareholder, agent, consultant, contractor, or subcontractor of Marubeni for any violations committed by them.

### Corporate Compliance Program

    8.    Marubeni represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA, the anti-corruption provisions of Japanese law, and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials. Implementation

of these policies and procedures shall not be construed in any future enforcement proceeding as providing immunity or amnesty for any crimes, not disclosed to the Department as of the date of signing of this Agreement, for which Marubeni would otherwise be responsible.

9.   In order to address any deficiencies in internal controls, policies, and procedures regarding compliance with the FCPA, the anti-corruption provisions of Japanese law, and other applicable anti-corruption laws, Marubeni represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of the existing internal controls, policies, and procedures within Marubeni.  Where necessary and appropriate, and consistent with Japanese law, regulation, and accounting standards, Marubeni will adopt new or modify existing internal controls, policies, and procedures in order to ensure that Marubeni maintains: (a) a system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  The internal controls system and compliance code will include, but not be limited to, the minimum elements set forth in Attachment C, which is incorporated by reference into this Agreement.

10.     Marubeni agrees that it will report to the Department periodically regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C, as follows:

a.      By no later than one (1) year from the date this Agreement is executed, Marubeni shall submit to the Department a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve Marubeni's internal controls, policies, and procedures for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent review. The report shall be transmitted to Deputy Chief - FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Fourth Floor, Washington, DC 20530. Marubeni may extend the time period for issuance of the report with prior written approval of the Department.

b.      Marubeni shall undertake a follow-up review incorporating the Department's views on Marubeni's initial review and report, to further monitor and assess whether Marubeni's policies and procedures are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws. The follow-up review and report shall be completed by no later than one (1) year after the initial review.

## Corporate Compliance Consultant

11.    Marubeni agrees to engage a corporate compliance consultant.  The consultant's term, duties, and authority, and the obligations of Marubeni with respect to the consultant, are set forth in Attachment D, which is incorporated by reference into this Agreement.

## Deferred Prosecution

12.    In consideration of: (a) the cooperation of Marubeni described in Paragraph 5 above; (b) Marubeni's payment of a monetary penalty of $54,600,000; and (c) Marubeni's adoption and maintenance of remedial measures, including the compliance code described in Paragraphs 8 and 9 above, the Department agrees that any prosecution of Marubeni for the conduct set forth in the attached Statement of Facts, and for any conduct that Marubeni disclosed to the Department prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

13.    The Department further agrees that if Marubeni fully complies with all of its obligations under this Agreement, the Department will not continue the criminal prosecution against Marubeni described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within thirty (30) days of the

Agreement's expiration, the Department shall seek dismissal with prejudice of the Information filed against Marubeni described in Paragraph 1.

### **Breach of the Agreement**

14.     If, during the Term of this Agreement, the Department determines, in its sole discretion, that Marubeni has (a) committed any felony under United States federal law subsequent to the signing of this Agreement, (b) at any time provided deliberately false, incomplete or misleading information to the Department, or (c) otherwise breached the Agreement, Marubeni shall thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge and the Information described in Paragraph 1 may be pursued by the Department in the U.S. District Court for the Southern District of Texas.  Any such prosecution may be premised on information provided by Marubeni.  Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Marubeni notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, Marubeni agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date of this Agreement shall be tolled for the Term plus one year.

15.    In the event that the Department determines that Marubeni has breached this Agreement, the Department agrees to provide Marubeni with written notice of such breach prior to instituting any prosecution resulting from such breach. Marubeni shall, within thirty (30) days of receipt of such notice, have the opportunity to respond to the Department in writing to explain the nature and circumstances of such breach, as well as the actions Marubeni has taken to address and remediate the situation, which explanation the Department shall consider in determining whether to institute a prosecution.

16.    In the event that the Department determines that Marubeni has breached this Agreement: (a) all statements made by or on behalf of Marubeni to the Department or to the Court, including the attached Statement of Facts, and any testimony given by Marubeni before a grand jury or any tribunal, at any legislative hearings, whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against Marubeni; and (b) Marubeni shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence or any other federal rule, that statements made by or on behalf of Marubeni prior or subsequent to this Agreement, and any leads derived therefrom,

13

should be suppressed.  The decision as to whether conduct or statements of any Marubeni employee, officer, director, or agent will be imputed to Marubeni for the purpose of the Department determining whether Marubeni has violated any provision of this Agreement shall be in the sole discretion of the Department.

17.     Marubeni acknowledges that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if Marubeni breaches this Agreement and this matter proceeds to judgment.  Marubeni further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Sale or Merger of Marubeni

18.     Marubeni agrees that in the event it either sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger, or transfer, Marubeni shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

## Public Statements by Marubeni

19.     Marubeni expressly agrees that it shall not, through present or future attorneys, directors, officers, employees, agents, or any other person authorized to speak for Marubeni, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Marubeni set forth above or the facts described in the attached Statement of Facts.   Any such contradictory statement shall, subject to cure rights described below, constitute a breach of this Agreement and Marubeni thereafter shall be subject to prosecution as set forth in Paragraphs 14-17 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to Marubeni for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Department.  If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify Marubeni, and Marubeni may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. Consistent with the obligations of Marubeni as set forth above, Marubeni shall be permitted to raise defenses and to assert affirmative claims in civil, regulatory, or foreign proceedings relating to the matters set forth in the Statement of Facts.  This

Paragraph does not apply to any statement made by any present or former employee of Marubeni in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Marubeni.

20.    Marubeni agrees that if it or any of its direct or indirect affiliates or subsidiaries issues a press release in connection with this Agreement, Marubeni shall first consult the Department to determine whether (a) the text of the release is true and accurate with respect to matters between the Department and Marubeni; and (b) the Department has no objection to the release.

## Limitations on Binding Effect of Agreement

21.    This Agreement is binding on Marubeni and the Department but specifically does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the Department will bring the cooperation of Marubeni and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities, if requested to do so by Marubeni.

## Notice

22.    Any notice to the Department under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or

registered or certified mail, in each case, for the Department, addressed to Deputy Chief-FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, Fourth Floor, 1400 New York Avenue, N.W., Washington, D.C. 20005 and, for Marubeni, addressed to its outside legal counsel, Derek Adler, Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004. Notice shall be effective upon actual receipt by Marubeni's outside legal counsel.

<u>Complete Agreement</u>

23.    This Agreement sets forth all the terms of the agreement between Marubeni and the Department. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorney for Marubeni, and a duly authorized representative of Marubeni.


**AGREED:**

**FOR MARUBENI:**

By: _____
Yutaka Nomura
Managing Executive Officer, Member of
the Board: COO, Legal Department &
Chairman of Compliance Committee
Marubeni Corporation

17

_____

Derek Adler
Marc A. Weinstein
Hughes Hubbard & Reed LLP

Counsel for Marubeni Corporation

**FOR THE DEPARTMENT OF JUSTICE:**

DENIS J. McINERNEY
Chief, Fraud Section
Criminal Division
United States Department of Justice

By: _____

William J. Stuckwisch
Assistant Chief
D.C. Bar No. 457278

_____

Patrick F. Stokes
Deputy Chief
Maryland State Bar

United States Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C.  20005
Tel: (202) 353-2393
Fax: (202) 514-0152

Washington, D.C., on this __16th__ day of January, 2012.

18

## EXECUTIVE OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Marubeni Corporation ("Marubeni"). I understand the terms of this Agreement and voluntarily agree, on behalf of Marubeni, to each of its terms. Before signing this Certificate, I consulted outside counsel for Marubeni. Counsel fully advised me of the rights of Marubeni, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the members of the Board of Directors of Marubeni. The members of the Board of Directors have been fully advised of the rights of Marubeni, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of Marubeni, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Managing Executive Officer, Member of the Board: COO, Legal Department & Chairman of Compliance

Committee for Marubeni and that I have been duly authorized by Marubeni to

execute this Certificate on behalf of Marubeni.

Date: January ___16th___, 2012

                            **MARUBENI CORPORATION**

                            By: _____
                                Yutaka Nomura
                                Managing Executive Officer, Member of
                                the Board: COO, Legal Department &
                                Chairman of Compliance Committee
                                Marubeni Corporation

20

## CERTIFICATE OF COUNSEL

I am outside counsel for Marubeni Corporation ("Marubeni") in the matter covered by this Agreement. In connection with such representation, I have examined relevant documents and have discussed the terms of this Agreement with the members of Marubeni's Board of Directors. I have carefully reviewed the terms of this Agreement with the members of the Board of Directors and the Managing Executive Officer, Member of the Board: COO, Legal Department & Chairman of Compliance Committee for Marubeni. I have fully advised them of the rights of Marubeni, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, the decision of Marubeni to enter into this Agreement, based on the authorization of Marubeni's Board of Directors, is an informed and voluntary decision.

Date: January __16__, 2012

Derek Adler
Marc A. Weinstein
Hughes Hubbard & Reed LLP

Counsel for Marubeni Corporation

21

## CERTIFICATE OF JAPANESE COUNSEL

I am outside counsel for Marubeni Corporation ("Marubeni") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Marubeni documents. Based on my review of the foregoing materials, I am of the opinion that: the representative of Marubeni has been duly authorized to enter into this Agreement on behalf of Marubeni, this Agreement has been duly and validly authorized, executed, and delivered on behalf of Marubeni, and this Agreement is a valid and binding obligation of Marubeni.

Date: January 16, 2012

Hiroshi Kimeda
Yukiko Yamada
Nishimura & Asahi

Counsel for Marubeni Corporation

22

# ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement ("the Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Department"), and Marubeni Corporation ("Marubeni"), and the parties hereby agree and stipulate that the following information is true and accurate. As set forth in Paragraph 2 of the Agreement, Marubeni admits, accepts, and acknowledges that it is responsible for the acts of its employees and agents as set forth below.

Should the Department pursue the prosecution that is deferred by this Agreement, Marubeni agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.

If this matter were to proceed to trial, the Department would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to this Agreement. This evidence would establish the following:

***The Defendant***

1.     At all relevant times, Marubeni was a major Japanese trading company headquartered in Tokyo, Japan, with operations around the world, including in Nigeria.

***TSKJ, Its Members, and Related Entities***

2.     "TSKJ" was a four-company venture formed in 1990 for the purposes of bidding on and, if successful, performing a series of EPC contracts to design and build a liquefied natural gas ("LNG") plant and several expansions on Bonny Island, Nigeria (the "Bonny Island Project"). TSKJ consisted of Technip S.A., Snamprogetti Netherlands B.V., Kellogg, Brown and Root, Inc., and JGC. The Steering Committee of TSKJ consisted of high-level executives from each joint venture company. Pursuant to a joint venture agreement, the Steering Committee made major decisions on behalf of TSKJ, including whether to hire agents to assist TSKJ in winning EPC contracts, whom to hire as agents, and how much to pay the agents. Profits, revenues, and expenses generally were shared equally among the four joint venture partners.

3.     Kellogg, Brown & Root, Inc. and, before September 1998, its predecessor company, The M.W. Kellogg Company (collectively, "KBR"), were engaged in the business of providing EPC services around the world. KBR was

incorporated in Delaware and headquartered in Houston, Texas. KBR was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

4.     Albert Jackson Stanley ("Stanley") was a United States citizen and a resident of Houston, Texas. Stanley served in various capacities as an officer and/or director of KBR, and also served on TSKJ's Steering Committee. Stanley was a "domestic concern" and an officer, employee, and agent of a "domestic concern" (KBR) within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

5.     Technip S.A. ("Technip") was a French EPC company headquartered in Paris, France. In August 2001, Technip registered a class of securities with the United States Securities and Exchange Commission ("SEC") and in October 2001 became listed on the New York Stock Exchange. As an issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78l, Technip was required to file periodic reports with the SEC under Section 13 of the Securities Exchange Act, Title 15, United States Code, Section 78m. Beginning in August 2001, Technip was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

3

6.     Snamprogetti Netherlands B.V. ("Snamprogetti") was a Dutch corporation headquartered in Amsterdam, The Netherlands, and a wholly owned subsidiary of Snamprogetti S.p.A., an Italian EPC company headquartered in Milan, Italy.

7.     M.W. Kellogg Ltd. was a corporation organized under the laws of the United Kingdom.  At all relevant times, M.W. Kellogg Ltd. was 55% owned by KBR and 45% owned by JGC Corporation.

8.     JGC Corporation ("JGC") was a Japanese company headquartered in Yokohama, Japan.  JGC was engaged in the business of providing engineering, procurement, and construction ("EPC") services around the world.

9.     TSKJ operated through three Portuguese special purpose corporations based in Madeira, Portugal: "Madeira Company 1," "Madeira Company 2," and "Madeira Company 3."  Both Madeira Company 1 and Madeira Company 2 were owned equally by the joint venture companies.  Madeira Company 3, the entity that TSKJ used to enter into consulting agreements with TSKJ's agents, was 50% owned by M.W. Kellogg Ltd., 25% owned by Snamprogetti, and 25% owned by Technip.

4

### TSKJ's Agents

10.    Jeffrey Tesler was a citizen of the United Kingdom and a resident of London, England.  TSKJ hired Tesler to help it obtain business in Nigeria, including by offering to pay and paying bribes to high-level Nigerian government officials.  Tesler was an agent of TSKJ and of each of the joint venture companies.

11.    Tri-Star Investments Ltd. ("Tri-Star") was a Gibraltar corporation that Tesler used as a corporate vehicle to enter into agent contracts with and receive payments from TSKJ.  By the time TSKJ had stopped paying Tri-Star in January 2004, TSKJ had paid Tri-Star over $130 million for use in bribing Nigerian government officials.  Tri-Star was an agent of TSKJ and of each of the joint venture companies.

12.    In addition to Tesler, TSKJ also hired Marubeni to help it obtain and retain business in Nigeria, including by offering to pay and paying bribes to Nigerian government officials.  By the time TSKJ had stopped paying Marubeni in June 2004, TSKJ had paid Marubeni $51 million in part for use in bribing Nigerian government officials.  Marubeni was an agent within the meaning of the FCPA of TSKJ and of each of the joint venture companies, including KBR and Technip.  Thus, MARUBENI was an agent of a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2, and an agent of an

5

"issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

***The Nigerian Government Entities***

13.     The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian government-owned company charged with development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry.  NNPC was a shareholder in certain joint ventures with multinational oil companies.  NNPC was an entity and instrumentality of the Government of Nigeria and officers and employees of NNPC were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

14.     Nigeria LNG Limited ("NLNG") was created by the Nigerian government to develop the Bonny Island Project and was the entity that awarded the related EPC contracts.  The largest shareholder of NLNG was NNPC, which owned 49% of NLNG.  The other owners of NLNG were multinational oil companies.  Through the NLNG board members appointed by NNPC, among other means, the Nigerian government exercised control over NLNG, including but not limited to the ability to block the award of EPC contracts.  NLNG was an entity and instrumentality of the Government of Nigeria and its officers and employees

were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

### The Bonny Island Project

15.    Between 1995 and 2004, TSKJ was awarded four EPC contracts to build the Bonny Island Project.  Each EPC contract corresponded to one of the four phases in which the Bonny Island Project was constructed.  An LNG "train" is the infrastructure necessary to pipe raw natural gas from wellheads, convert the raw gas to purified LNG, and deliver that LNG to a tanker.  The first phase of the Bonny Island Project consisted of two trains (Trains 1 and 2), the second phase consisted of one train (Train 3), the third phase consisted of two trains (Trains 4 and 5), and the fourth phase consisted of one train (Train 6).  The first EPC contract, covering Trains 1 and 2, was awarded to TSKJ through an ostensibly competitive international tender.  The other three EPC contracts were awarded to TSKJ on a sole-source, negotiated basis.  The four EPC contracts awarded to TSKJ collectively were valued at over $6 billion.

### Overview of the Bribery Scheme and the Violations

16.    From at least in or around August 1994, through June 15, 2004, Marubeni and its co-conspirators, including TSKJ, KBR, Technip, Snamprogetti, JGC, Stanley, Tesler, Tri-Star, and others, participated in a scheme to authorize,

7

promise, and pay tens of millions of dollars in bribes to Nigerian government officials, including officials of the executive branch of the Government of Nigeria, officials of NNPC, officials of NLNG, and others, in order to secure the Nigerian government officials' assistance in obtaining and retaining billions of dollars of business related to the Bonny Island Project for TSKJ, KBR, Technip, Snamprogetti, JGC, and others.  Employees of Marubeni, Stanley, other officers, employees, and agents of KBR, and their co-conspirators willfully used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of the authorization, promise, and payment of bribes to Nigerian government officials pursuant to the scheme.  Employees of Marubeni, Stanley, other officers, employees, and agents of KBR, and other co-conspirators committed acts in furtherance of the scheme in Houston, Texas, and elsewhere in the United States.

17.     Employees of Marubeni and their co-conspirators held so-called "cultural meetings" in which they discussed, among other things, the use of particular agents, including Tesler and Marubeni, to pay bribes to officials of the Government of Nigeria in order to secure the officials' support for TSKJ in obtaining and retaining contracts to build the Bonny Island Project.

18.     In 1994, 1999, 2001, and 2002, officers, employees, and agents of Marubeni's co-conspirators authorized the hiring of Tesler and Tri-Star by TSKJ,

8

expecting that Tesler and Tri-Star would pay bribes to high-level Nigerian government officials to assist TSKJ, KBR, Technip, Snamprogetti, JGC, and others in obtaining and retaining the EPC contracts to build the Bonny Island Project. In 1996, 1999, and 2001, officers, employees, and agents of Marubeni's co-conspirators also authorized the hiring of Marubeni by TSKJ, expecting that Marubeni would pay bribes to lower level Nigerian government officials to assist TSKJ, KBR, Technip, Snamprogetti, JGC, and others in obtaining and retaining the EPC contracts to build the Bonny Island Project.

19.    Marubeni and its co-conspirators caused Madeira Company 3 to execute consulting contracts with Tri-Star and Marubeni providing for the payment of tens of millions of dollars in consulting fees in exchange for vaguely described marketing and advisory services, when in fact the primary purpose of the contracts was to facilitate the payment of bribes on behalf of TSKJ and its members to Nigerian government officials.

20.    Prior to NLNG's award to TSKJ of the various EPC contracts, Stanley and others met with successive holders of a top-level office in the executive branch of the Government of Nigeria to ask the office holder to designate a representative with whom TSKJ should negotiate bribes to Nigerian government officials, and

subsequently negotiated with the office holders' representatives regarding the amount of the bribes that TSKJ would pay to the Nigerian government officials.

21.    Marubeni's co-conspirators caused wire transfers totaling approximately $132 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts in New York, New York, to be further credited to bank accounts in Switzerland and Monaco controlled by Tesler for Tesler to use to bribe Nigerian government officials.

22.    On behalf of TSKJ and the four joint venture companies, Tesler wire transferred bribe payments to or for the benefit of various Nigerian government officials, including officials of the executive branch of the Government of Nigeria, NNPC, and NLNG, and for the benefit of a political party in Nigeria.

23.    Marubeni and its co-conspirators caused wire transfers totaling $51 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to Marubeni's bank account in Japan intending for Marubeni to use such funds for, among other purposes, bribery of Nigerian government officials.

***Details of the Bribery Scheme and the Violations***

24.    On or about August 3, 1994, Wojciech Chodan ("Chodan"), an M.W. Kellogg Ltd. salesperson responsible for the Bonny Island Project, sent a facsimile from London, England, to Stanley in Houston, Texas, two JGC executives, and

another co-conspirator stating, among other things, that Stanley and other top executives of the joint venture companies had agreed to send a message "to the top man that we are ready to do business in the customary manner" and to ask Marubeni to secure support from the key individuals at the working level of NLNG.

25.    On or about November 2, 1994, Tesler told Chodan that he had spoken with a senior official of the Nigerian Ministry of Petroleum, that Tesler's fee would be $60 million, that the first top-level executive branch official of the Government of Nigeria would get $40-45 million of that fee, that other Nigerian government officials would get the remaining $15-20 million of that fee, and that there would be a meeting between Stanley and the first top-level Nigerian executive branch official before execution of any written agreement between TSKJ and Tesler.

26.    On or about November 30, 1994, Stanley, an employee of Marubeni, and other co-conspirators met with the first top-level executive branch official in Abuja, Nigeria, to verify that the official was satisfied with TSKJ using Tesler as its agent and to confirm that the official wanted TSKJ to negotiate with the senior official of the Ministry of Petroleum the amounts of bribes to various Nigerian government officials.

27.    On or about March 20, 1995, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $60 million to Tri-Star if TSKJ was awarded a contract to construct Trains 1 and 2 of the Bonny Island Project.

28.    On or about November 15, 1995, Chodan sent a fax to other employees of the TSKJ companies stating that Marubeni was seeking a larger down payment on its agreement for Trains 1 and 2 and recommending that TSKJ agree to a $5 million down payment.

29.    On or about December 27, 1995, Madeira Company 3 wire transferred $1,542,000 to Tri-Star, via a correspondent bank account in New York, New York, in payment of Tri-Star's first invoice under the consulting agreement for Trains 1 and 2.

30.    On or about April 9, 1996, Madeira Company 3 entered into an agreement with Marubeni whereby it agreed to pay Marubeni $29 million for assisting TSKJ in winning the contract to build Trains 1 and 2 of the Bonny Island Project.

31.    On or about July 26, 1996, Tesler caused $63,000 to be wire transferred to a Swiss bank account controlled by the senior official of the Ministry of Petroleum.

32.     On or about May 1, 1997, Stanley, an employee of Marubeni, and other co-conspirators met in Abuja, Nigeria, with the top-level executive branch official and requested that the official designate a representative with whom TSKJ should negotiate bribes to Nigerian government officials in exchange for the first top-level executive branch official's support of the award to TSKJ of an EPC contract to build Train 3. At the meeting, the top-level executive branch official designated a senior executive branch official as his representative.

33.     On or about February 28, 1999, Stanley and other co-conspirators met in Abuja, Nigeria, with a second top-level executive branch official to request that the second top-level executive branch official designate a representative with whom TSKJ should negotiate bribes to Nigerian government officials in exchange for the second top-level executive branch official's support of the award to TSKJ of an EPC contract to build Train 3. At the meeting, the second top-level executive branch official designated one of his advisers as his representative.

34.     On or about March 5, 1999, Stanley and other co-conspirators met at a hotel in London, England, with the adviser designated by the second top-level executive branch official to negotiate the amount of bribes to be paid to the second top-level executive branch official and other Nigerian government officials in exchange for the award to TSKJ of an EPC contract to build Train 3. The amount

13

negotiated with the representative formed the basis for the $32.5 million fee that TSKJ promised to pay Tri-Star.

35.    On or about March 18, 1999, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $32.5 million to Tri-Star if TSKJ was awarded a contract to construct Train 3 of the Bonny Island Project.

36.    On or about April 7, 1999, Marubeni faxed a letter to Stanley in Houston, Texas, regarding Marubeni's fee for Train 3.

37.    On or about March 13, 2000, Madeira Company 3 entered into an agreement with Marubeni promising to pay it $4 million in connection with Train 3 of the Bonny Island Project.

38.    On or about January 16, 2001, Tesler caused $2.5 million to be wire transferred to a Swiss bank account controlled by the representative designated by the second top-level executive branch official of the Government of Nigeria.

39.    On or about November 11, 2001, Stanley and a KBR salesperson met in Abuja, Nigeria, with a third top-level executive branch official of the Government of Nigeria and an NNPC official (the "NNPC Official") to request that the third top-level executive branch official designate a representative with whom TSKJ should negotiate the bribes to Nigerian government officials in

14

exchange for the third top-level executive branch official's support of the award of the Trains 4 and 5 EPC contract to TSKJ. At the meeting, the third top-level executive branch official designated the NNPC Official as his representative.

40.    On or about December 24, 2001, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $51 million to Tri-Star if TSKJ was awarded a contract to construct Trains 4 and 5 of the Bonny Island Project.

41.    In or about June 2002, Tesler, the NNPC Official, and an employee of one of TSKJ's subcontractors (the "Subcontractor") met at a hotel in London, England, to discuss the NNPC Official's request that the Subcontractor help funnel payments from Tesler to a political party in Nigeria.

42.    On or about June 14, 2002, Madeira Company 3 entered into an agreement with Marubeni providing, among other things, that Madeira Company 3 would pay $25 million to Marubeni in connection with Trains 4 and 5 of the Bonny Island Project.

43.    On or about June 18, 2002, a KBR salesperson caused to be sent through Houston, Texas, for transmittal to Tesler an e-mail regarding mechanisms for paying lower level Nigerian government officials.

44.     On or about June 28, 2002, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $23 million to Tri-Star if TSKJ was awarded a contract to construct Train 6 of the Bonny Island Project.

45.     In or about August 2002, an employee of the Subcontractor, using funds that Tri-Star had wire transferred to the Subcontractor, delivered a pilot's briefcase containing one million U.S. dollars in one hundred dollar bills to the NNPC Official at a hotel in Abuja, Nigeria, for the benefit of a political party in Nigeria.

46.     On or about March 4, 2003, Chodan caused to be e-mailed to two KBR executives in Houston, Texas, a draft memo for release to French authorities investigating potential crimes in connection with the Bonny Island Project that included false statements about how Tesler had helped TSKJ win the various EPC contracts.

47.     In or about April 2003, an employee of the Subcontractor, using funds that Tri-Star had wire transferred to the Subcontractor, delivered a vehicle containing Nigerian currency valued at approximately $333,333 to the hotel of the NNPC Official in Abuja, Nigeria, for the benefit of a political party in Nigeria.

48.     On or about May 30, 2003, Madeira Company 3 wire transferred $123,500 to Tri-Star, via a correspondent bank account in New York, New York, in payment of one of Tri-Star's invoices under the consulting agreement for Train 3 of the Bonny Island Project.

49.     On or about June 15, 2004, Madeira Company 3 wire transferred $3 million to Marubeni in payment of one of Marubeni's invoices under the agreement for Trains 4 and 5 of the Bonny Island Project.

50.     Between on or about August 6, 2002, and on or about June 15, 2004, employees and co-conspirators of Marubeni willfully aided, abetted, counseled, commanded, induced, procured, and caused the commission of FCPA violations by KBR, a domestic concern within the meaning of the FCPA, by aiding and abetting KBR in corruptly acting outside the United States in causing wire transfers of $17 million from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts of Marubeni in Japan pursuant to Madeira Company 3's agreement with  Marubeni for Trains 4 and 5, intending that the money would be used in part to pay bribes to Nigerian government officials.

## ATTACHMENT B

## CERTIFICATE OF CORPORATE APPROVAL

I, Kazunobu Teraoka, General Manager of Legal the Department of Marubeni Corporation, a corporation duly organized and existing under the laws of Japan, with its principal office at 4-2, Ohtemachi 1-chome, Chiyoda-ku, Tokyo, Japan (hereinafter the "Corporation"), hereby certify that:

1.      The Corporation has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section ("the Department") about certain illegal conduct described in Attachment A to a certain Deferred Prosecution Agreement proposed to be entered into between the Department and the Corporation (the "Agreement").

3.      In order to resolve such discussions, the Board of Directors has considered that the Corporation enter into the Agreement with the Department.

4.      The Company's Managing Executive Officer, Member of the Board: COO, Legal Department & Chairman of Compliance Committee, together with outside counsel for the Corporation, have advised the members of the Board of Directors of the Corporation of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Department.

5.    At a meeting of the board of directors of this Corporation duly convened on the 11th day of January, 2012, the execution, delivery and performance by this Corporation of the Agreement with the United States of America, was duly approved by this Corporation and the approval has not been amended or revoked in any respect and remains in full force and effect; and

6.    Mr. Yutaka Nomura, who has executed the Agreement on behalf of the Corporation, is Managing Executive Officer, Member of the Board: Chief Operating Officer of the Legal Department of this Corporation and has authority to execute and deliver the Agreement in the name and on behalf of this Corporation.

IN WITNESS WHEREOF, I have signed this Certificate of Corporate Approval on this 16th day of January, 2012.

Kazunobu Teraoka
General Manager
Legal Department
Marubeni Corporation

2

# ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in internal controls, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §78dd-1, *et seq.,* and other applicable anti-corruption laws, Marubeni Corporation (the "company") agrees to conduct, in a manner consistent with this Agreement, a review of its existing internal controls, policies, and procedures.

Where necessary, appropriate, and not unlawful, the company further agrees to adopt new or to modify existing internal controls, policies and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that the company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements:

1.     A clearly articulated corporate policy against violations of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws;

2.     Consistent with applicable Japanese law, regulations, and accounting standards, a system of financial and accounting procedures, including a system of internal accounting controls, designed to ensure the maintenance of fair and accurate books, records, and accounts.

3.     Promulgation of a compliance code, standards, and procedures designed to detect and deter violations of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws, and the company's compliance code. This code and these standards and procedures should apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the company in foreign jurisdictions, including agents, consultants, representatives, distributors, and joint venture partners (collectively referred to as "agents and business partners").

4.     The assignment of responsibility to one or more senior corporate officials of the company for the implementation and oversight of compliance with policies, standards, and procedures regarding the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws. This senior corporate official shall have authority to report matters directly to the Board of Directors or an appropriate committee of the Board of Directors and the Chairman of the Compliance Committee.

5.    Mechanisms designed to ensure that the policies, standards, and procedures of the company regarding the FCPA and other applicable anti-corruption laws are effectively communicated to all directors, officers, employees and, where necessary and appropriate, agents and business partners.    These mechanisms shall include where necessary and appropriate: periodic training for all such directors, officers, employees, agents, and business partners; and annual certifications with regard to this training by all such directors, officers, employees, agents, and business partners.

6.    An effective system for reporting, consistent with Japanese law and regulation, and for supporting those who in good faith report suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws for directors, officers, employees, agents, and business partners.

7.    Appropriate disciplinary procedures, consistent with Japanese law and regulation, to address, among other things, violations of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws, or the company's compliance code by directors, officers, and employees.

8.    Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

9.     Standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are designed to prevent violations of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws, which may, depending upon the circumstances, include: anti-corruption representations and undertakings relating to compliance with the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws; rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and rights to terminate an agent or business partner as a result of any violation of the FCPA, Japanese anti-corruption laws, or other anti-corruption laws or breach of representations and undertakings related to such matters.

10.     Periodic testing of the compliance code, standards, and procedures to evaluate their effectiveness in detecting and reducing violations of the FCPA, Japanese anti-corruption laws, other applicable anti-corruption laws, and the company's policy against such violations.

## ATTACHMENT D

## INDEPENDENT COMPLIANCE CONSULTANT

1.　　Within sixty (60) calendar days of the filing of the Deferred Prosecution Agreement (the "Agreement") and the accompanying Information, Marubeni Corporation ("Marubeni") agrees to retain an independent compliance consultant (the "Compliance Consultant") for the term specified in paragraph 2 below. The Compliance Consultant's responsibility is to evaluate Marubeni's corporate compliance program with respect to the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, 15 U.S.C. §78dd-1, *et seq.*, Japanese laws implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("Japanese anti-corruption laws"), and other relevant anti-corruption laws. The Compliance Consultant shall have, at a minimum, the following qualifications:

　　　　　　a.　　demonstrated expertise with respect to the FCPA and other relevant anti-corruption laws and the design, review, implementation, and testing of corporate compliance policies, procedures, and internal controls;

　　　　　　b.　　the ability to access and deploy resources as necessary to discharge the Compliance Consultant's duties as described in the Agreement; and

　　　　　　c.　　sufficient independence from Marubeni to ensure effective and

1

impartial performance of the Compliance Consultant's duties as described in the Agreement.

2.      Subject to an extension pursuant to paragraph 3 of the Agreement, the Compliance Consultant's term shall expire two (2) years from the date of the Compliance Consultant's engagement. If the Compliance Consultant resigns or is otherwise unable to fulfill his or her obligations as set out herein, Marubeni shall within sixty (60) calendar days retain a new Compliance Consultant. The Compliance Consultant's duties and authorities, and the obligations of Marubeni with respect to the Compliance Consultant and the Department, are set forth below.

3.      Marubeni agrees that it will not employ or be affiliated with the Compliance Consultant for a period of not less than one year from the date on which the term of the Compliance Consultant expires.

4.      The Compliance Consultant will review and evaluate the effectiveness of Marubeni's internal controls, record-keeping, and financial reporting policies and procedures as they relate to Marubeni's compliance with the anti-bribery provisions of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws. The Compliance Consultant shall assess whether Marubeni's existing policies and procedures are reasonably designed to detect and prevent violations of the FCPA, Japanese anti-corruption laws, and other

2

applicable anti-corruption laws.  The Compliance Consultant's review and evaluation shall include an assessment of Marubeni's implementation of and adherence to all existing, modified, or new policies and procedures relating to compliance with the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws.  The Compliance Consultant shall ensure that Marubeni's anti-corruption policies and procedures are appropriately designed to accomplish their goals.  The retention agreement between Marubeni and the Compliance Consultant will reference the Agreement and include it as an attachment so the Compliance Consultant is fully apprised of his or her duties and responsibilities.

5.     Marubeni shall cooperate fully with the Compliance Consultant, consistent with Japanese law, and the Compliance Consultant shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the corporate compliance program of Marubeni within the scope of his or her responsibilities under this Agreement, which are to review and evaluate the effectiveness of Marubeni's internal controls, record-keeping, and financial reporting policies and procedures as they relate to Marubeni's compliance with the anti-bribery provisions of the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws.  To that end, Marubeni shall provide the Compliance Consultant with access to all information, documents, and records that

3

are not subject to protection from disclosure by Japanese law, the attorney-client privilege or the attorney work product doctrine, and facilities and employees that fall within the scope of responsibilities of the Compliance Consultant under this Agreement.

    a.  The parties agree that the Compliance Consultant is an independent third-party, not an employee or agent of the Company or the Department, and that no attorney-client relationship shall be formed between Marubeni and the Compliance Consultant.

    b.  In the event that Marubeni seeks to withhold from the Compliance Consultant access to information, documents, records, facilities, and/or employees of Marubeni on grounds that the information, documents, records, facilities, and/or employees are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or Japanese law, Marubeni shall work cooperatively and in good faith with the Compliance Consultant to resolve the matter to the satisfaction of the Compliance Consultant.

    c.  Except as provided in this paragraph, Marubeni shall not withhold from the Compliance Consultant any information, documents, records, facilities, and/or employees on any other ground.

    6.  During the Compliance Consultant's term, the Compliance Consultant

4

shall conduct annual reviews and prepare annual written reports. With respect to each review, the Compliance Consultant shall prepare a written work plan after consultation with Marubeni. The proposed work plan shall be submitted to Marubeni no fewer than sixty (60) calendar days prior to commencing each review. Marubeni shall have no more than ten (10) calendar days after receipt of the proposed written work plan to provide comment to the Compliance Consultant about the work plan. The Compliance Consultant's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Agreement. In developing each work plan and in carrying out the reviews pursuant to such plans, the Compliance Consultant is encouraged to coordinate with Marubeni personnel, including auditors and compliance personnel. To the extent the Compliance Consultant deems appropriate, it may rely on Marubeni processes, on the results of studies, reviews, audits, and analyses conducted by or on behalf of Marubeni, and on sampling and testing methodologies. Any disputes between Marubeni and the Compliance Consultant with respect to the work plan shall be resolved by the Compliance Consultant, which resolution shall be binding.

7. The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Compliance Consultant

(unless otherwise agreed by Marubeni and the Compliance Consultant), and the Compliance Consultant shall issue a written report within one hundred twenty (120) calendar days of initiating the initial review, setting forth the Compliance Consultant's assessment and making recommendations reasonably designed to improve the effectiveness of Marubeni's program for ensuring compliance with the FCPA, Japanese anti-corruption laws, and other applicable anti-corruption laws. The Compliance Consultant shall consult with Marubeni concerning its findings and recommendations on an ongoing basis, and is encouraged to consider and reflect Marubeni's comments and input to the extent the Compliance Consultant deems appropriate. The Compliance Consultant shall not in its initial or subsequent reports recite or describe comprehensively Marubeni's history of compliance policies, procedures, and practices, but rather shall focus on those areas with respect to which the Compliance Consultant wishes to make recommendations for future improvement or which the Compliance Consultant otherwise concludes merit particular attention, if any. The Compliance Consultant shall provide the report to the Board of Directors of Marubeni. After consultation with Marubeni, the Compliance Consultant may extend the time period for issuance of the report for up to sixty (60) calendar days.

      8.    Within one hundred and twenty (120) calendar days after receiving

the Compliance Consultant's report, Marubeni shall adopt all recommendations in the report unless within sixty (60) calendar days after receiving the report, Marubeni notifies the Compliance Consultant in writing of any recommendations that Marubeni considers unduly burdensome, inconsistent with local or other applicable law or regulation, impractical, unduly expensive, or otherwise inadvisable. With respect to any recommendation Marubeni considers unduly burdensome, inconsistent with local or other applicable law or regulation, impractical, unduly expensive, or otherwise inadvisable, Marubeni need not adopt that recommendation within one hundred and twenty (120) calendar days after receiving the Compliance Consultant's report, but shall propose in writing to the Compliance Consultant an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which Marubeni and the Compliance Consultant do not agree, the parties shall attempt in good faith to reach an agreement. With respect to any recommendation the Compliance Consultant determines cannot reasonably be implemented within one hundred and twenty (120) calendar days after receiving the report, the Compliance Consultant may extend the time period for implementation.

      9.    The Compliance Consultant shall undertake one (1) follow-up review, unless the term of the Compliance Consultant is extended under Paragraph 3 of the

7

Agreement to a term of three years, in which case the Compliance Consultant shall undertake two (2) follow-up reviews. Within one hundred and twenty (120) calendar days of initiating a follow-up review, the Compliance Consultant shall: (a) complete the review; (b) report on whether the compliance program of Marubeni, including its policies and procedures, is reasonably designed and implemented to detect and prevent violations within Marubeni of relevant anti-corruption laws; and (c) report on the Compliance Consultant's findings in the same fashion as set forth in Paragraph 8 with respect to the initial review. The follow-up review shall commence one year after the initial review commenced. If there is a second follow-up review, it shall commence two years after the first review commenced. After consultation with Marubeni, the Compliance Consultant may extend the time period for these follow-up reviews for up to sixty (60) calendar days.

10. In undertaking the assessments and reviews described in Paragraphs 4 through 9, the Compliance Consultant shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including Marubeni's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of Marubeni at sample sites, including internal controls and record-keeping and internal audit procedures; (c) meetings with and interviews

8

of relevant employees, officers, directors, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of Marubeni's compliance program with respect to anti-corruption laws.

11.    In the event that Marubeni or any entity or person working directly or indirectly within Marubeni refuses to provide information necessary for the Compliance Consultant to perform its duties, the Compliance Consultant shall raise the issue directly with the Chairman of the Compliance Committee, and seek to resolve the matter.  Marubeni shall not take any action to retaliate against the Compliance Consultant for any such disclosures.